■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v WILLIAM J. CLARK, JR., Appellant. [883 NYS2d 824]—

Mercure, J. Appeal from a judgment of the County Court of Saratoga County (Scarano, J.), rendered March 27, 2008, upon a verdict convicting defendant of the crimes of criminal contempt in the first degree (six counts), stalking in the second degree and criminal contempt in the second degree (six counts).

In October 2006, defendant was convicted of numerous crimes, including stalking in the third degree, arising out of his harassment of the victim, his former girlfriend (*People v Clark*, 52 AD3d 860 [2008], *lv denied* 11 NY3d 831 [2008]). Thereafter, County Court issued an order of protection directing defendant to stay away from her home and place of employment, and refrain from all contact with her. The present case involves defendant's almost immediate disregard of that order and his ongoing campaign of harassment and intimidation of the victim.

According to the victim, on December 8, 2006, defendant—acting in violation of the order of protection—placed a letter on her car windshield while she was at work and telephoned her six times, with one conversation ensuing. On December 11, 2006, defendant reached the victim twice by telephone, during which time he related details of the victim's recent activities and demanded intimate information about her relationship with another man. The first telephone call ended when the victim hung up and, during the second call, defendant warned the victim not to hang up on him again. Nevertheless, the victim advised defendant in no uncertain terms that she wanted to be left alone and that he was violating the order of protection, and she promptly reported the contact to law enforcement officials.

Defendant next accosted the victim at a gas station four days later, on December 15, 2006. The victim agreed to speak to him in order to tell him face-to-face that she wanted to be left alone. As the victim sat in her locked car with her window cracked open, defendant indicated again that he was aware of the details of her recent activities, as well as the activities of her family, revealing that he had improperly obtained private and confidential information about her father's finances.[1] The victim reported the incident to law enforcement officials on the following business day.

On December 26, 2006, defendant made two more telephone

---

**1.** We note that the victim's father testified that defendant had obtained this information from his payroll stub, which was most likely taken from the inside of his home.

calls to the victim, who again told him that he was violating the order of protection and that she wanted to be left alone. More disturbingly, when the victim arrived at work that same night, defendant ran up to her car and began screaming and pounding on the driver's side window, demanding to know how she could "do this to" him. It was dark outside at the time, and defendant was wearing dark clothes and a dark hat. The victim called 911 on her cell phone and frantically shouted to a coworker for help, and defendant fled before police arrived.

A few days after that encounter, the victim entered a locked house into which she was planning to move and discovered various items allegedly left by defendant for her in the kitchen. Among other things, defendant had allegedly left a gift card purchased in the store where the victim worked—the same store at which he had pounded on her car window on December 26, 2006, as she arrived for work. Subsequently, a number of documents were discovered in defendant's residence that belonged to the victim or her family, and were obtained either from inside the victim's home and workplace or from the garbage outside of those locations. Defendant also had a list of the names, addresses and telephone numbers of the victim and her family members, as well as photographs of the victim in which her head had been cut out.

Defendant was thereafter charged in an indictment with numerous counts relating to the above incidents. Following a jury trial, during which defendant represented himself, he was convicted of six counts of criminal contempt in the first degree, one count of stalking in the second degree and six counts of criminal contempt in the second degree. Defendant was sentenced as a second felony offender to an aggregate prison term of 8 to 16 years. He appeals, and we now affirm.

Initially, we reject defendant's argument that the proof presented at trial was legally insufficient to support his convictions of criminal contempt in the first degree.[2] In reviewing whether a jury verdict is supported by sufficient evidence, we "must determine whether there is any valid line of reasoning and permissible inferences which could lead a rational person to the conclusion reached by the jury on the basis of the evidence at trial" (*People v Bleakley*, 69 NY2d 490, 495 [1987]; *see People v Brown*, 61 AD3d 1007, 1009 [2009]). Four of the six counts arose out of the individual telephone conversations of December 8, December 11 (the two calls on that date constituting separate

---

2. Defendant suggests that his other convictions are similarly deficient, but he makes no arguments regarding the remaining charges and, in any event, we perceive no merit in such claims.

counts) and December 26, 2006. On those charges, the People were required to demonstrate that defendant "intentionally place[d] or attempt[ed] to place [the victim] in reasonable fear of physical injury, serious physical injury or death" through the calls (Penal Law § 215.51 [b] [iii]). Thus, although the victim testified that she found the telephone calls threatening and disturbing, the People were required to demonstrate that her fear was "objectively reasonable" through, for example, evidence that defendant's course of conduct carried "an express or implied threat of violence" (*People v Demisse*, 24 AD3d 118, 119 [2005], *lv denied* 6 NY3d 833 [2006]).

In that regard, while defendant did not expressly threaten the victim in any of the telephone calls, the inherent menace in the calls becomes apparent when viewed in the broader context of the proof in this case. A review of the record reveals that, among other things, defendant engaged in threatening actions toward the victim during the period when the telephone calls were made, most notably when he ran up to her car at night and proceeded to scream and pound on the window. Furthermore, he revealed to the victim, through his repeated detailed descriptions of her recent activities, that he was following and surveilling her. Notably, the jury was made aware that defendant's earlier interactions with the victim led to his conviction on charges of criminal contempt in the second degree, attempted criminal contempt in the second degree and stalking in the third degree. In addition, there was evidence that defendant routinely disregarded previous temporary orders of protection in favor of the victim and that a separate order of protection prevented him from having contact with the victim's father, with whom the victim lived and who had been threatened by defendant.

Given these facts, the jury could rationally conclude that the victim's fear of injury or death was objectively reasonable (*see e.g. People v McCowan*, 45 AD3d 888, 889-890 [2007], *lv denied* 9 NY3d 1007 [2007]; *Matter of Ivan F.*, 233 AD2d 210, 210-211 [1996]; *People v Henderson*, 12 Misc 3d 60, 61 [App Term 2006], *lv denied* 7 NY3d 902 [2006]). In particular, the jury could reasonably infer, based upon this evidence when viewed in conjunction with defendant's possession of personal information about the victim and headless photographs of her, that defendant intended to, and did, produce a reasonable fear in the victim regarding her physical safety (*see People v Malave*, 60 AD3d 410, 410-411 [2009], *lv denied* 12 NY3d 855 [2009]; *cf. People v Brown*, 61 AD3d at 1009-1010). That evidence is also legally sufficient to support the convictions upon the remaining two

counts of first degree criminal contempt, which allege that defendant repeatedly followed the victim or otherwise engaged in a course of conduct with the intent of causing her to have a reasonable fear of injury or death (*see* Penal Law § 215.51 [b] [ii]), and that he repeatedly telephoned her with the sole intention of harassing or threatening her (*see* Penal Law § 215.51 [b] [iv]). Nor are we persuaded, after reviewing the evidence in a neutral light and deferring to the jury's determinations of credibility, that the verdict was against the weight of the evidence (*see People v McCowan*, 45 AD3d at 889-890). The jury properly credited the victim's testimony, notwithstanding defendant's prolonged efforts to call her version of events into question.[3]

Defendant next argues that he was deprived of a fair trial by the prosecutor's summation comments that he disliked "individuals who attempt to testify without taking that witness stand" and that, if an individual was "not willing to take that witness stand and be cross-examined, then they shouldn't be testifying." Contrary to defendant's assertion, those comments did not call the jury's attention to defendant's failure to testify; rather, the comments refer to defendant's conduct in making numerous improper factual assertions while questioning witnesses-despite being repeatedly instructed not to do so-and his subsequent attempts to cite his own assertions as evidence in his summation. Under these circumstances, the comments could not "naturally and reasonably be interpreted by the jury as adverse comment on defendant's failure to take the stand" (*People v Burke*, 72 NY2d 833, 836 [1988]; *see People v Reyes*, 239 AD2d 306 [1997], *lv denied* 90 NY2d 909 [1997]).

Finally, there is no merit to defendant's contention that his sentence was harsh and excessive, particularly in light of his extensive and violent criminal history, disturbing attern of conduct towards the victim and wholesale disregard for orders of protection.

Cardona, P.J., Lahtinen, Malone Jr. and Stein, JJ., concur. Ordered that the judgment is affirmed.

---

**3.** Defendant, who represented himself as noted above, engaged in a repetitive and harassing cross-examination of the victim which took the better part of four days to complete. The cross-examination was so punishing that one juror had to be excused after she found it too "hard to take."